EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| San Gerónimo Caribe Project<br><br>        Peticionario<br><br>            v.<br><br>Marisol Marchand,<br>Registradora de la<br>Propiedad, Registro de la<br>Propiedad de Puerto Rico,<br>Sección Primera de San Juan<br><br>        Recurrida | Certiorari<br><br>2013 TSPR 138<br><br>189 DPR ____ |

Número del Caso: RG-2013-3
                 RG-2013-4


Fecha: 27 de noviembre de 2013


Abogados de la Parte Peticionaria:

        Lcdo. Antonio R. Molina Machargo
        Lcda. María D. Trelles Hernández

Abogada de la Parte Recurrida:

        Lcda. Marisol Marchand Castro
        Registradora de la Propiedad
        Sección Primera de San Juan


Materia: Derecho Registral – Aplicación y Alcance de la Norma Duodécima del Art. 2 de la Ley de Aranceles del Registro de la Propiedad


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

San Gerónimo Caribe Project
        Peticionario

        v.

Marisol Marchand, Registradora
de la Propiedad, Registro de
la Propiedad de Puerto Rico,
Sección Primera de San Juan
        Recurrida

Recurso
Gubernativo

RG-2013-003
RG-2013-004

Opinión del Tribunal emitida por el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 27 de noviembre de 2013.

La corporación, San Gerónimo Caribe Project, Inc. (SGCP) nos solicita que revoquemos dos recalificaciones de la Registradora de la Propiedad de la Sección Primera de San Juan, Hon. Marisol Marchand, (la Registradora). En éstas, la Registradora denegó la inscripción de la declaración de edificación, la compraventa de finca y estacionamiento comercial, la constitución del derecho de superficie, la constitución del Régimen de Propiedad Horizontal, entre otros, por insuficiencia en el pago de derechos de inscripción.

En ese contexto, estos Recursos Gubernativos nos proveen la oportunidad de expresarnos en cuanto al alcance e interpretación de la Norma Duodécima del Art. 2 de la Ley de Aranceles del Registro de la Propiedad, 30 L.P.R.A. sec. 1767(b), (la Norma Duodécima). Específicamente esta normativa dispone que:

> "En caso de enajenación, cesión o compraventa de fincas gravadas con hipotecas según el Registro de la Propiedad, de no constar del documento la inclusión de dichas hipotecas en el precio de venta, se tomará como base el precio de enajenación, cesión o compraventa o la suma total de las hipotecas, lo que **resulte mayor** a los efectos de la cancelación de los correspondientes derechos de inscripción". (Énfasis suplido).

Examinados ambos recursos decidimos consolidar los mismos por presentar controversias similares de derecho. Luego de analizar con rigor el estado de derecho aplicable, adelantamos que confirmamos la calificación de la Registradora. Pasemos a dilucidar los escenarios fácticos que dan lugar a esta controversia.

## I.
## RG-2013-003

La SGCP es titular de una finca de 6,098.9650 metros cuadrados (equivalentes a 1.5517 cuerdas) en el área de San Juan en la cual desarrolló un proyecto mixto constituido por una Edificación Comercial y un estacionamiento. Este estacionamiento se construyó bajo la Edificación Comercial, y corresponde al Condominio Residencial denominado Laguna Plaza. El Condominio Laguna Plaza consta de nueve plantas en las que ubican treinta y tres unidades de apartamentos destinados a

uso residencial. Esa Edificación Comercial no es parte de dicho inmueble y constituye una finca separada e independiente. Ahora bien, el estacionamiento para el Condominio Laguna Plaza, ubicado en el sótano de la estructura total, sí es parte del Condominio. La Edificación Comercial y el Condominio Laguna Plaza fueron conceptualizados como unidades económicas independientes. Para el financiamiento de la estructura total, SGCP obtuvo préstamos garantizados con hipotecas por la suma de $73,126,636 para la construcción tanto de la Edificación Comercial, como del Condominio Laguna Plaza.

El 18 de junio de 2009, luego de finalizar la construcción de la Edificación Comercial y del Condominio Laguna Plaza, SGCP presentó en el Registro de la Propiedad la Escritura Núm. 2, objeto de la calificación y la denegatoria de recalificación recurrida. Mediante la referida escritura, SGCP llevó a cabo los siguientes actos: (1) declaró la existencia de la Edificación Comercial sobre la finca de 6,098.9650 metros cuadrados (equivalentes a 1.5517 cuerdas); (2) vendió la finca y la Edificación Comercial (pero no el Condominio) a San Gerónimo Caribe Parking, Inc. (SGC Parking), una afiliada de SGCP; (3) se reservó un derecho de superficie sobre (i) la cubierta de la primera y única planta de la Edificación Comercial, en la que se apoya el Condominio y (ii) el sótano donde

ubican los estacionamientos del Condominio Laguna Plaza; (4) inscribió trece servidumbres; (5) sometió las nueve plantas construidas sobre la Edificación Comercial al derecho de superficie y el sótano donde ubican los estacionamientos para los residentes de dicho Condominio al Régimen de Propiedad Horizontal.

Por su parte, los valores atribuidos a los actos instrumentados mediante la Escritura Núm. 2 son los siguientes: (1) la Edificación Comercial se valoró en $11,000,000, ello de acuerdo a una carta de valor emitida por los tasadores para ese inmueble; **(2) la compraventa de la Edificación Comercial de SGCP a SGC Parking se valoró en $11,000,000;** (3) el derecho de superficie sobre la Edificación Comercial fue valorado en $1,000; y (4) cada una de las servidumbres se valoró en $1,000, ascendiendo a un total de $13,000 por las trece servidumbres; (5) el Condominio Laguna Plaza fue valorado en $33,065,000, de conformidad con la tasación preparada por Luis E. Vallejo, M.A.I., de la firma Vallejo & Vallejo. En vista de ello, el valor total de las transacciones consignadas en la Escritura fue de $55,079,000.

Este fue el valor que utilizó como base para calcular y pagar los derechos de inscripción de $220,270. Al someter la Escritura Núm. 2 no se había liberado ninguna parte del negocio antes expuesto de la suma total de los préstamos garantizados con hipotecas.

Estos préstamos se habían obtenido para financiar la construcción tanto de la Edificación Comercial como del Condominio Laguna Plaza. Así, al momento de presentarse la referida Escritura, tanto la finca y la Edificación Comercial, como el Condominio Laguna Plaza, estaban gravados con hipotecas que sumaban $73,126,636. Al presentar ante el Registro de la Propiedad la Escritura Núm. 2, se cancelaron las siguientes sumas de derechos de inscripción: (1) por la declaración de la existencia de la Edificación Comercial, valorada en $11,000,000, se pagaron $43,950; **(2) por la compraventa de la finca y Edificación Comercial, valorada en $11,000,000, se pagaron $43,950;** (3) por el derecho de superficie sobre la Edificación Comercial, valorado en $1,000, se pagaron $2; (4) por las servidumbres, valoradas en $13,000, se pagaron $26; y (5) por la constitución del Régimen de Propiedad Horizontal sobre el Condominio Laguna Plaza, se pagaron $132,210.

Así las cosas, el 17 de enero de 2013, durante el proceso de calificación de la Escritura, la Registradora razonó que de acuerdo a la Norma Duodécima, _supra_, se debía valorar la compraventa de la finca y la Edificación Comercial (que se había llevado a cabo por $11,000,000) en $73,126,636. Ello así, porque las hipotecas que SGCP había constituido para financiar el desarrollo completo y efectuar todas las

transacciones incluidas en la Escritura sumaban en total $73,126,636.

Por su parte, SGCP sostuvo que al así obrar, la Registradora obvió el hecho de que las hipotecas se habían constituido para financiar la construcción del proyecto en su totalidad y de los derechos contenidos en la Escritura. A su vez, entendió que el valor total de los componentes y derechos comprendidos en la Escritura es de $55,079,000, a base de los cuales se pagaron derechos de inscripción, y que el mismo debía distribuirse proporcionalmente a través de las transacciones efectuadas.

El 5 de febrero de 2013 SGCP presentó Solicitud de Recalificación y el 28 de febrero de 2013 la Registradora notificó la Calificación final denegando la misma. Como consecuencia de la decisión de la Registradora, se denegó la inscripción de: (1) la Edificación Comercial declarada; (2) el dominio sobre la finca y la Edificación Comercial; (3) el derecho de superficie sobre la Edificación Comercial; (4) las servidumbres; y (5) el Régimen de Propiedad Horizontal para el Condominio Laguna Plaza. Insatisfecho con ese dictamen, SGCP recurre mediante Recurso Gubernativo y puntualiza que la Registradora erró al requerir derechos de inscripción de $248,376 adicionales a los $220,270 ya pagados por SGCP. En atención a ello, solicita que revoquemos la Calificación Final.

## II.
## RG-2013-004

Por otro lado, SGCP es dueño de una finca de 6,588.8785 metros cuadrados (equivalentes a 1.6763 cuerdas) en el área de San Juan en la cual desarrolló un proyecto mixto compuesto de un Estacionamiento Comercial, un Condominio residencial llamado Caribe Plaza que está construido sobre una porción de la última planta del Estacionamiento Comercial y un estacionamiento correspondiente al Condominio residencial que construyó debajo del Estacionamiento Comercial sometido al derecho de superficie. El Estacionamiento Comercial cuenta con ocho plantas y el Condominio Caribe Plaza consta de catorce plantas, en las que ubican cuarenta y siete unidades de apartamentos destinados a uso residencial. Además, este último tiene un estacionamiento para los residentes que está localizado en el sótano de la estructura total, es decir, debajo del Estacionamiento Comercial. El Estacionamiento Comercial sobre el cual se construyó el Condominio Caribe Plaza no es parte de dicho Condominio y constituye una finca separada e independiente. Empero, el estacionamiento para ese Condominio, ubicado en el sótano de la estructura total, sí lo es. En otras palabras, el Estacionamiento Comercial y el Condominio Caribe Plaza se conceptualizaron como unidades económicas independientes.

Para el financiamiento de la estructura total, SGCP obtuvo préstamos garantizados con hipotecas por la suma de $95,050,000 para la construcción tanto del Estacionamiento Comercial, como del Condominio Caribe Plaza. El 23 de julio de 2007, luego de finalizar la construcción en su totalidad, SGCP presentó ante el Registro de la Propiedad, la Escritura Núm. 10, objeto de la calificación y denegatoria de recalificación de la que se recurre.

Mediante el referido instrumento público, SGCP llevó a cabo los siguientes actos: (1) declaró la existencia del Estacionamiento Comercial sobre la finca de 6,588.8785 metros cuadrados (equivalentes a 1.6763 cuerdas); (2) vendió la finca y el Estacionamiento Comercial (pero no el Condominio) a SGC Parking; (3) se reservó un derecho de superficie sobre (i) la cubierta de la octava y última planta del Estacionamiento Comercial, en la que se apoya el Condominio y (ii) el sótano donde ubican los estacionamientos del Condominio Caribe Plaza; (4) inscribió doce servidumbres; y (5) sometió las catorce plantas construidas sobre el Estacionamiento Comercial al amparo del derecho de superficie y el sótano en donde ubican los estacionamientos para los residentes de dicho Condominio al Régimen de Propiedad Horizontal.

Los valores atribuidos a los actos llevados a cabo mediante la Escritura Núm. 10 son los siguientes: (1)

el Estacionamiento Comercial de cuya existencia se dio fe se valoró en la cifra de $19,040,000, ello en virtud de que el permiso de construcción para dicho estacionamiento y sobre el cual se pagaron los correspondientes arbitrios de construcción era por esa cantidad; **(2) la compraventa del Estacionamiento Comercial de SGCP a SGC Parking fue por $19,040,000;** (3) el derecho de superficie sobre el Estacionamiento Comercial fue valorado en $1,000; (4) cada una de las servidumbres se valoró en $1,000, ascendiendo a un total de $12,000 por las doce servidumbres; (5) el Condominio Caribe Plaza fue valorado en $86,000,000 de acuerdo a la tasación preparada por Luis E. Vallejo, M.A.I., de la firma Vallejo & Vallejo. Así pues, el valor total de todas las transacciones expuestas en la Escritura Núm. 10 ascendió a $124,093,000. Consecuentemente, los derechos de inscripción que SGCP pagó por la Escritura Núm. 10 se calcularon a base de esa cifra de $124,093,000.

Al momento de presentar la Escritura Núm. 10 no se había liberado ninguna parte del negocio antes expuesto de la suma total de los préstamos garantizados con hipotecas que se habían obtenido para poder financiar la construcción tanto del Estacionamiento Comercial como del Condominio Caribe Plaza. Así, al momento de presentarse la referida Escritura, la finca, el

Estacionamiento Comercial y el Condominio Caribe Plaza estaban gravados por hipotecas que sumaban $95,050,000.

Al presentar ante el Registro de la Propiedad la aludida Escritura Núm. 10, se pagaron las siguientes cantidades por derechos de inscripción: (1) por la declaración de la existencia del Estacionamiento Comercial, valorado en $19,040,000, se pagaron $76,110; **(2) por la compraventa de la finca y del Estacionamiento Comercial, valorado en $19,040,000, se pagaron $76,110;** (3) por el derecho de superficie sobre el Estacionamiento Comercial, valorado en $1,000 se pagaron $2; (4) por las servidumbres, valoradas en $12,000, se pagaron $24; y (5) por la constitución del Régimen de Propiedad Horizontal sobre el componente del Condominio Caribe Plaza, se pagaron $343,950. En vista de lo anterior, SGCP pagó derechos de inscripción por un total de $496,322, los cuales fueron pagados a base de una cifra total de $124,093,000, que, según SGCP, es la suma de los valores de las distintas transacciones contenidas en la Escritura Núm. 10.

Así las cosas, el 17 de enero de 2013, la Registradora notificó dos defectos relacionados con la Escritura objeto de este recurso: (1) la ausencia de un comprobante por $303,914 para completar los derechos de inscripción y (2) unas diferencias entre la escritura matriz y los planos y/o "plot plans" de ciertas

unidades del Condominio Caribe Plaza.[1] En cuanto al primer defecto, la Registradora coligió que el pago de los derechos era necesario de conformidad con la Norma Duodécima, *supra,* del Art. 2 de la Ley Hipotecaria y del Registro de la Propiedad, según enmendada. También razonó que se le debía atribuir el valor de la suma de las hipotecas ($95,050,000) que garantizaban los préstamos obtenidos para la construcción de la estructura total (Estacionamiento Comercial y Condominio Caribe Plaza) y la constitución de todos los derechos expresados en la Escritura Núm. 10 únicamente a la compraventa de la finca y Estacionamiento Comercial.

Oportunamente, el 5 de febrero de 2013 SGCP presentó un Escrito de Recalificación en el que adujo que el primer error notificado, es decir, la ausencia de un comprobante por $303,914 para completar los derechos de inscripción, era improcedente en derecho. En síntesis, SGCP arguyó que la postura de la Registradora al notificar la falta de comprobante por $303,914 es contraria a la Ley y a la intención legislativa. Además, sostuvo que tal determinación lleva a resultados irrazonables, ello puesto que SGCP

---

[1] En cuanto al segundo defecto, relacionado a inconsistencias entre la escritura matriz y los planos y/o "plot plans", SGCP notificó que someterían documentos para atender ese señalamiento. La Calificación Final denegando la inscripción notificada el 28 de febrero de 2013 no hace referencia a este asunto. Se incluye referencia a este alegado defecto únicamente para propósitos de trasfondo, ya que la controversia entre el Registro de la Propiedad y SGCP no está relacionada con este asunto.

ya había pagado derechos de inscripción sobre una base total de $124,093,000.

El 28 de febrero de 2013, la Registradora notificó una denegatoria final de la inscripción solicitada por faltar un comprobante de $303,914 para completar los derechos de inscripción. Como consecuencia, se denegó la inscripción de: (1) la Edificación Comercial (el Estacionamiento Comercial) declarada; (2) la inscripción del dominio sobre la finca y el Estacionamiento Comercial; (3) el derecho de superficie sobre el Estacionamiento Comercial; (4) las servidumbres, y (5) el Régimen de Propiedad Horizontal para el Condominio Caribe Plaza. Consecuentemente, ninguna de las compraventas de los distintos apartamentos que componen el Condominio Caribe Plaza ha tenido acceso al Registro. Por su parte, SGCP objetó la calificación efectuada por la Registradora en cuanto requirió derechos de inscripción adicionales a los ya pagados en la suma de $303,914. También entendió que aplicó e interpretó la Norma Duodécima incorrecta y mecánicamente a una de las transacciones efectuadas mediante la Escritura Núm. 10, y, además, obvió interpretar y aplicar dicha norma de forma cónsona con su propósito.

Expuestos los escenarios fácticos que dan lugar a estos recursos gubernativos, pasemos a expresar el derecho aplicable a las controversias presentadas.

**III.**

## A. Principio de Legalidad Registral

El principio de legalidad exige que los títulos que pretendan ingresar en el Registro sean sometidos a un examen o calificación. L.R. Rivera Rivera, _Derecho Registral Inmobiliario Puertorriqueño_, 3ra ed., San Juan, Ed. Jurídica Editores, 2012, pág. 271. En cuanto al principio de legalidad, en la obra _Derecho Hipotecario_ podemos apreciar que:

> [e]l principio de legalidad, en lo que atañe a la publicidad registral inmobiliaria, es el que impone que los títulos que pretendan su inscripción en el Registro de la Propiedad sean sometidos a un previo examen, verificación o calificación, a fin de que en los libros hipotecarios solamente tengan acceso los títulos válidos y perfectos, interna o materialmente y externa o formalmente. R. Roca Sastre y otros. _Derecho Hipotecario_, 9na ed., Tomo I, Barcelona, Ed. Bosch, S.A., 2008, pág. 614.

Entre los asuntos que el Registrador tiene que verificar al calificar un documento presentado en el Registro de la Propiedad figura el pago de los correspondientes derechos de inscripción.

La Ley Núm. 91 de 30 de mayo de 1970, según enmendada, conocida como "Ley de Aranceles del Registro de la Propiedad" (Ley de Aranceles), 30 L.P.R.A. secs. 1767a-1767e, regula los derechos que se pagarán por las operaciones del Registro de la Propiedad. Estos preceptos fijan los derechos que se pagarán cuando se solicita una inscripción, anotación, cancelación o liberación en el Registro de la Propiedad. _E.S.J. Towers, Inc. v. Registrador,_ 150 D.P.R. 298, 311 (2000). Hemos reconocido

que la Ley de Aranceles es un estatuto tributario, por lo que los aranceles tienen el carácter de contribución. Díaz v. Registrador, 107 D.P.R. 233, 238 (1978). No obstante, cabe destacar que esta ley tiene entre sus propósitos eliminar la doble tributación y evitar el cobro "mecánico" de aranceles respecto a los derechos en sí. Esto es así ya que la legislación contributiva no se puede interpretar extensivamente, sino de forma justa y según sus propios términos para que toda ambigüedad se interprete restrictivamente contra el Estado y a favor del ciudadano. IFCO Recycling v. Aut. Desp. Sólidos, 184 D.P.R. 712, 741 (2012); Pagán Rodríguez v. Registradora, 177 D.P.R. 522, 537 (2009); B.B.C. Realty v. Secretario de Hacienda, 166 D.P.R. 498, 511 (2005).

En cuanto a este asunto, en S.B. Pharmco P.R., Inc. v. Registrador, 148 D.P.R. 336, 348 (1999), dijimos que "[e]l valor del arancel registral requerido para la inscripción o cancelación de cualquier asiento, ya sea el principal o accesorio, queda establecido en virtud del valor de la finca o del derecho a inscribirse o a cancelarse".

Al computar los derechos de inscripción que corresponde para cada transacción es preciso referirnos al texto de la Norma Duodécima que expresa lo siguiente:

> "En caso de enajenación, cesión o compraventa de fincas gravadas con hipotecas según el Registro de la Propiedad, de no constar del documento la inclusión de dichas hipotecas en el precio de venta, se tomará como base el precio de enajenación, cesión o compraventa o la suma total de las hipotecas, lo

que **resulte mayor** a los efectos de la cancelación de los correspondientes derechos de inscripción". (Énfasis suplido).

La citada norma responde al propósito legislativo de que el arancel se aplique sobre la base que mejor refleje el valor en el mercado de la propiedad transmitida. Somohano v. Registrador, 39 D.P.R. 774, 775 (1929). Por ello, hemos reafirmado que si en la venta, voluntaria o forzosa, de la finca hipotecada, subsisten gravámenes anteriores y preferentes, los derechos de registro se gravarán conforme a esa norma. Aponte Parés v. Registrador, 106 D.P.R. 176, 179 (1977).

Asimismo, hemos ratificado que el propósito moderno e irreversible que infiltra el arancel es aproximar en lo posible la base impositiva al valor real del derecho objeto de la operación registral. Empire Life Ins. Co. v. Registrador, 105 D.P.R. 136, 140 (1976); Aponte Parés v. Registrador, 106 D.P.R. 176, 179 (1977). Como observamos, la doctrina jurisprudencial no deja al azar ni a la voluntad de las partes la valoración del derecho objeto de inscripción. De otra parte, se puede instar un recurso gubernativo ante este Tribunal cuando el presentante entienda que el Registrador de la Propiedad ha establecido erróneamente el pago de derechos que devenga una operación en el Registro de la Propiedad. Art. 4 de la Ley de Aranceles, 30 L.P.R.A. sec. 1767d; Art. 74 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2227; Pagán Rodríguez v.

*Registradora*, supra, pág. 526; Chase Manhattan Bank v. Registrador, 98 D.P.R. 92, 95 (1969).

Por otro lado, en Empire Life Ins. Co. v. Registrador, *supra*, no quedaba gravamen subsistente pues se trataba de una primera hipoteca ejecutada en subasta. En ese caso se tomó como valor del inmueble y base para cómputo de derechos de arancel, el principal de la hipoteca ejecutada en lugar del precio del importe de la licitación que obtuvo la buena pro en la subasta.

> "No encontramos razón en la contención de la recurrente que propone reducir la base de cómputo del arancel a dos por ciento (2%) del principal de la hipoteca, elemento representativo del verdadero valor del inmueble ejecutado que consiste en 3.22 cuerdas bordeadas por el Atlántico y la Laguna del Condado en el norte de la Avenida Ashford del Condado, San Juan, solar sobre el que se ha edificado un hotel de turismo. Tampoco se cumple el principio de legalidad ajustando el cobro de derechos a la desproporción resultante de pagar $150,000 por lo que fue buena garantía de $7,000,000". Empire Life Ins. Co. v. Registrador, supra. pág. 141.

Siendo la calificación función de raciocinio, la Registradora correctamente concluyó que la cifra mayor es más representativa del valor envuelto en la operación de Registro y por tanto sujeto a arancel. Mencionamos que, "[a]l así calificar, la Registradora sólo cumplió con el deseable objetivo de excluir la ficción y abrir el Registro a la realidad del verdadero valor del inmueble o derecho inscrito". Empire Life Ins. Co v. Registrador, *supra*, pág. 142. El utilizar ese método para determinar el valor sujeto a arancel, ayuda a acercar el Registro a la realidad del verdadero valor del inmueble y excluye la

ficción que representan los valores irrisorios. ESJ
Towers, Inc. v. Registrador, supra, pág. 314; Aponte Parés
v. Registrador, supra, pág. 178.

De otro lado, la cuestión central planteada por el
recurso gubernativo objeto de controversia en Lincoln
American Corporation v. Registrador, 106 D.P.R. 781, era
si tenía que cumplirse la orden judicial computando
derechos de arancel sobre la cantidad realmente
desembolsada por el acreedor y recibida por el deudor o si
la base para el pago de aranceles debía ser el principal
de la hipoteca. Sobre esa interrogante, expresamos que la
controversia no puede evadir la regla de Empire Life Ins.
Co. v. Registrador, supra, que utiliza el principal de la
hipoteca a cancelar como la base racional, lógica y real
del cómputo para los derechos de inscripción.

Estos principios habían sido adoptados hace varias
décadas en Balbás v. Registrador, 45 D.P.R. 804 (1933)
donde se descartó el precio de adjudicación en subasta y
se utilizó el valor del derecho hipotecado, es decir, el
principal de la hipoteca, para fijar los derechos de
inscripción. Esta norma responde al propósito que infiltra
el arancel de aproximar en lo posible la base impositiva
al valor real del derecho objeto de la operación
registral. Al aplicar el arancel del Registro de la
Propiedad, el Registrador puede descartar el valor
aparente, convenientemente expresado en la escritura de
venta judicial, por el valor real que satisface la razón y

el entendimiento. Empire Life Ins. Co. v. Registrador, supra, pág. 142.

La doctrina y la jurisprudencia han reconocido que la operación del Registro de la Propiedad confronta en la práctica dos realidades: la realidad registral y la extrarregistral. En los casos donde existe alguna discrepancia entre estas realidades, se puede presumir que existe una ficción que ha accedido al Registro de la Propiedad o que ha sido presentado para ganar acceso al mismo. Para evitar estas discrepancias, el Registrador debe usar su facultad para negar acceso a actos artificiosos y para promover la fidelidad óptima en los libros del Registro de modo que se acerque su realidad a la realidad externa. Empire Life Ins. Co. v. Registrador, supra, pág. 141. La calificación se extiende a toda clase de documentos pertinentes para apreciar la procedencia del asiento, en una conjunción de todos los elementos del título presentado y contenido del Registro. Roca Sastre, Derecho Hipotecario, 6ta Ed. (1968), Tomo II, pág. 260; Empire Life Ins. Co. v. Registrador, supra.

Se ha interpretado y aplicado el arancel del Registro de la Propiedad desde su fijación temprana por la Ley de Aranceles en 1904 hasta la actual Ley Núm. 91 de 30 de mayo de 1970, supra, siguiendo estos principios y normas determinantes del valor real de la finca o derechos. Lincoln American Corp. v. Registrador, supra, pág. 784. Así pues, hemos reconocido que el Registrador de la

Propiedad tiene el deber en ley de exigir el pago de arancel como fue dispuesto. Correa Sánchez v. Registrador, 113 D.P.R. 581, 592 (1983).

**B. Principio de Indivisibilidad**

El principio de indivisibilidad de la hipoteca postula que la garantía hipotecaria subsiste íntegra sobre todas y cada una de las partes del crédito mientras éste no se cancele. El Art. 173 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2569, dispone que:

> [l]a hipoteca subsistirá íntegra sobre la totalidad de los bienes hipotecarios, mientras no se cancele, aunque se reduzca la obligación garantizada, y sobre cualquier parte de los mismos bienes que se conserven, aunque la restante haya desaparecido; pero sin perjuicio de lo que se dispone en las dos siguientes secciones.

Por su parte, el Art. 174 de la referida Ley, 30 L.P.R.A. sec. 2570, expresa que:

> [s]i una finca hipotecada se dividiere en dos o más, no se distribuirá entre ellas el crédito hipotecario sino cuando voluntariamente lo acordaren el deudor y el acreedor. No verificándose esta distribución, podrá repetir el acreedor por la totalidad de la suma garantizada contra cualquiera de las nuevas fincas en que se haya dividido la primera o contra todas a la vez.

No es posible liberar un apartamento de un crédito hipotecario afirmando que no se reduce en forma alguna ni el principal del pagaré ni de la hipoteca. Si el crédito hipotecario o el valor del pagaré no disminuyen, ¿en qué consiste la liberación? Nuestro ordenamiento registral no permite liberar en un asiento la hipoteca y dejar vigente el asiento del derecho real de hipoteca. Ello implicaría

burlar el pago de arancel hipotecario y notarial. Casa Blanca Properties, Inc. v. Registrador de la Propiedad, 130 D.P.R. 609 (1992), pág. 616.

En cuanto a los créditos hipotecarios constituidos y no cancelados antes de la dedicación de un inmueble al Régimen de Propiedad Horizontal se ha expresado lo siguiente:

> En algunos casos los créditos hipotecarios constituidos antes de la dedicación al Régimen de Propiedad Horizontal no han sido debidamente cancelados en el Registro de la Propiedad antes de presentarse para su inscripción, las escrituras de separación y venta de los apartamientos. El no cancelar los mencionados créditos hipotecarios perjudica a los adquirentes, y al Estado, y aventaja a los acreedores". Ponencias y comunicaciones presentadas al III Congreso Internacional de Derecho Registral, San Juan, Instituto del Derecho Registral y Notarial de Puerto Rico, 1977 T.I, págs. 489 y 490.

## C. Hermenéutica legal

Los tribunales tenemos el propósito de solucionar las controversias y de adjudicar los derechos de las partes en un pleito. Con ese criterio rector en mente debemos remitirnos al texto del Artículo 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14, el cual dispone que, cuando la ley es clara y libre de toda ambigüedad, la letra de la ley no debe ser menospreciada bajo el pretexto de cumplir con su espíritu. No hay necesidad de recurrir al subterfugio de indagar más allá de la ley para cumplir con su propósito legislativo cuando el texto de la ley es claro. Asoc. FCIAS v. Caribe Specialty II, 179 D.P.R. 923, 938 (2010).

El lenguaje claro y explícito de un estatuto no se debe tergiversar, mucho menos malinterpretar o sustituir. En ocasiones anteriores hemos dejado claro que los tribunales debemos interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones, supliendo así las posibles deficiencias cuando esto sea necesario. Pizarro v. Nicot, 151 D.P.R. 944 (2000), 951. Véanse además, Aquino González v. A.E.E.L.A., 182 D.P.R. 1, 39 (2011). La función de la Rama Judicial no es legislar, sino interpretar las leyes que aprueba la Rama Legislativa y constatar que éstas no estén reñidas con la Constitución. Marbury v. Madison, 5 U.S. 137 (1803). Véanse: Art. V., Sec. 4. Const. E.L.A.; Bomberos Unidos v. Cuerpo de Bomberos, 180 D.P.R. 723, 749 (2011).

Así mismo, en un sinnúmero de ocasiones hemos indicado que: "[a]nte el lenguaje claro, explícito y libre de toda ambigüedad o duda de un estatuto, no cabe menospreciar la letra de la ley bajo el pretexto de cumplir su espíritu, máxime cuando el espíritu o intención del estatuto son la misma cosa". Pueblo v. Castro Muñiz, 118 D.P.R. 625, 650 (1987). Véanse además: Bomberos Unidos v. Cuerpo de Bomberos, supra; Rullán v. A.E.E., 179 D.P.R. 433, 444 (2010); Piovanetti v. S.L.G. Tirado, 178 D.P.R. 745, 767 (2010). Para reconocer el curso seguido por la autoridad legislativa, es necesario examinar la hermenéutica. Es doctrina arraigada que cuando el lenguaje de una ley es claro y la intención legislativa patente, los tribunales

están obligados a respetar la voluntad del legislador. Véanse, Pueblo v. Negrón Rivera, 183 D.P.R. 271, 282 (2011); Raimundi v. Productora, 162 D.P.R. 215, 235 (2004).

Ese proceso de interpretar las leyes, que recibe el nombre de hermenéutica legal, consiste en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. Rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241; IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 738.

Al adentrarse en esa delicada faena, el Poder Judicial debe tener como norte que de todas las reglas de interpretación hay sólo una que es absolutamente invariable y es que en ese proceso "debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo". (Énfasis en el original.) R.E. Bernier y J.A. Cuevas Segarra, op. cit., pág. 242. Los tribunales somos intérpretes finales de las leyes. En consecuencia, "[n]os encontramos en la obligación y el deber ineludible de lograr un resultado que se ajuste al propósito y a la política pública que inspiró a la Legislatura al aprobarlas". IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 740; Consejo de Titulares v. D.A.Co., 181 D.P.R. 945, (2011).

Nuestro ordenamiento jurídico consigna determinadas normas de hermenéutica legal las cuales, en mayor o menor medida, se imponen como principios rectores del ejercicio de la función adjudicativa de los tribunales. Const. José Carro v. Mun. Dorado, 186 D.P.R. 113, 126 (2012).

En Consejo de Titulares v. Gómez Estremera, 184 D.P.R. 407, 428, (2012), tuvimos oportunidad de expresarnos sobre la discreción judicial en el contexto de interpretación de las leyes. Allí dijimos que:

> [l]os tribunales estamos autorizados **a interpretar** las leyes cuando, entre otras, éstas no son claras o concluyentes sobre un punto en particular; cuando el objetivo, al realizarlo, es el de suplir una laguna en la misma; o cuando, con el propósito de mitigar los efectos adversos de la aplicación de una ley a una situación en particular, la justicia así lo requiere… (Énfasis en el original). Véase, además, Pueblo v. Ortega Santiago, 125 D.P.R. 203, pág. 214 (1990).

Es un principio elemental de hermenéutica que a toda ley se le dará la interpretación que mejor responda a los propósitos que persigue. Los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes disposiciones, supliendo las posibles deficiencias cuando esto fuere necesario. Sucn. Álvarez v. Secretario de Justicia, 150 D.P.R. 252, 276 (2000). Como corolario de la doctrina, los tribunales, al ejercer su función interpretativa de la ley, deberán considerar el propósito o intención de la Asamblea Legislativa al aprobar la misma. Ello, a fines de propiciar la obtención del resultado querido por el legislador originalmente. Piovanetti v. S.L.G. Tirado, supra.

Como sabemos, el suplir estas posibles deficiencias legislativas mediante una interpretación que respete la intención última del legislador, es muy distinto a sustituir la intención legislativa por la del juzgador. Pueblo v. Ruiz, 159 D.P.R. 194, 210 (2003). A tenor con lo resuelto en Pueblo v. Ferreira Morales, 147 D.P.R. 238 (1998), los tribunales debemos interpretar los estatutos teniendo presente el propósito social que los inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias en los casos en que sea necesario. Sobre la interpretación que puede hacer el juzgador hemos reiterado que:

> [e]l profundo respeto que nos merece la intención del legislador nos obliga, en determinadas ocasiones, a suplir las inadvertencias en que éste pueda haber incurrido. Para evitar un resultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley para conformarlo a la intención legislativa. Es regla dorada de hermenéutica judicial, que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no conduzcan a resultados irrazonables e insostenibles, sino armoniosos. Domínguez Castro v. E.L.A., 178 D.P.R. 375, pág. 409 (2010)

En reiteradas ocasiones hemos resuelto que las interpretaciones de la ley que conduzcan a conclusiones absurdas deben ser rechazadas. Al ejercer la función interpretativa, estamos obligados a armonizar, en la medida posible, todas las disposiciones de ley envueltas en aras de obtener un resultado más sensato, lógico y razonable. Asoc. FCIAS v. Caribe Specialty II, supra, pág.

940; _Sucn. Álvarez Crespo v. Secretario de Justicia_,
supra, pág. 276.

Examinado el marco doctrinal y el ámbito de extensión e importancia del cómputo del pago de los derechos de inscripción para las distintas transacciones efectuadas en el Registro de la Propiedad, pasemos a resolver las controversias específicas que se presentan en los casos de autos consolidados.

**IV**

En los presentes casos, existen dos escrituras mediante las cuales se realizaron distintas transacciones, entre ellas dos compraventas. La notificación de faltas hecha por la Registradora establece que la transacción de las compraventas son las que resultan ser objeto de controversia, pues según su calificación, éstas precisaban pagar derechos de aranceles adicionales a los ya pagados.

Como hemos reseñado en los recursos gubernativos objeto de nuestro análisis, éstos contemplan varias transacciones sobre las fincas que se encuentran gravadas por hipotecas. Según refleja la notificación de faltas, tanto de la Escritura Núm. 2 como de la Escritura Núm. 10, el precio de venta de ambas fincas, constituye una cantidad menor que la suma de las hipotecas por las cuales están gravados los inmuebles.

Para la más cabal comprensión de los presentes recursos gubernativos es preciso destacar que la Edificación Comercial y el Condominio Laguna Plaza fueron

conceptualizados y son unidades económicas independientes. Para poder financiar la construcción de la estructura total, tanto de la Edificación Comercial como del Condominio Laguna Plaza, SGCP obtuvo préstamos garantizados con hipotecas por la suma de $73,126,636. La Escritura Núm. 2, objeto de calificación y denegatoria de recalificación de la que aquí se recurre contenía los siguientes actos: (1) declaración de la existencia de la Edificación Comercial sobre la finca de 6,098.9650 metros cuadrados; (2) venta de la finca y Edificación Comercial (pero no del Condominio) a San Gerónimo Caribe Parking, Inc., una afiliada de SGCP; (3) reserva de un derecho de superficie sobre (i) la cubierta de la primera y única planta de la Edificación Comercial, en la que se apoya el Condominio y (ii) el sótano donde ubican los estacionamientos del Condominio Laguna Plaza; (4) inscribió trece servidumbres; (5) sometió las nueve plantas construidas sobre la Edificación Comercial al amparo del derecho de superficie y el sótano donde ubican los estacionamientos para los residentes de dicho Condominio al Régimen de Propiedad Horizontal. Los valores atribuibles a los actos llevados a cabo mediante la Escritura Núm. 2 fueron los siguientes: (1) la Edificación Comercial de cuya existencia se dio fe se valoró en la cifra de $11,000,000, ello en virtud de una carta de valor emitida por los tasadores para dicha Edificación Comercial; (2) la compraventa de la Edificación Comercial

de SGCP a SGC Parking se valoró en $11,000,000; (3) el derecho de superficie sobre la Edificación Comercial fue valorado en $1,000; (4) las servidumbres fueron valoradas en $1,000 cada una, para un total de $13,000 por las trece servidumbres comprendidas; (5) el Condominio Laguna Plaza fue valorado en $33,065,000. Conforme a lo anterior, el valor total de las transacciones expuestas en la Escritura Núm. 2 ascendió a $55,079,000. Este fue el valor que SGCP utilizó como base para calcular y pagar los derechos de inscripción de $220,270. Es importante destacar que al momento de someter la Escritura Núm. 2 para su inscripción no se había liberado ninguna parte del negocio antes expuesto de la suma total de los préstamos garantizados con hipotecas que se habían obtenido para financiar la construcción tanto de la Edificación Comercial como del Condominio Laguna Plaza. Así las cosas, al momento de presentar la referida Escritura, tanto la finca y Edificación Comercial, como el Condominio Laguna Plaza estaban gravados con hipotecas que sumaban $73,126,636.

Por otro lado, para poder financiar la construcción de la estructura total, tanto del Estacionamiento Comercial como del Condominio Caribe Plaza, SGCP obtuvo préstamos, garantizados con hipotecas, por la suma total de $95,050,000. A través de la Escritura Núm. 10, SGCP efectuó las siguientes transacciones: (1) declaró la existencia del Estacionamiento Comercial sobre la finca de 6,588.8785 metros cuadrados; (2) vendió la finca y el

Estacionamiento Comercial a SGCP Parking; (3) reservó un derecho de superficie sobre (i) la cubierta de la octava y última planta del Estacionamiento Comercial, en la que se apoya el Condominio y (ii) el sótano donde ubican los estacionamientos del Condominio Caribe Plaza; y (4) sometió las catorce plantas construidas sobre el Estacionamiento Comercial al amparo del derecho de superficie y el sótano donde ubican los estacionamientos del Condominio Caribe Plaza; (4) inscribió doce servidumbres; (5) sometió las catorce plantas al amparo del derecho de superficie y el sótano en donde ubican los estacionamientos para los residentes de dicho Condominio al Régimen de Propiedad Horizontal. Los valores atribuibles a los actos llevados a cabo mediante la Escritura Núm. 10 son los siguientes: (1) el Estacionamiento Comercial de cuya existencia se dio fe se valoró en la cifra de $19,040,000, ello en virtud de que el permiso de construcción para dicho estacionamiento y en base al cual se pagaron los correspondientes arbitrios de construcción era por esa cantidad; (2) la compraventa del Estacionamiento Comercial de SGCP a SGC Parking fue por $19,040,000; (3) el derecho de superficie sobre el Estacionamiento Comercial fue valorado en $1,000; (4) cada servidumbre se valoró en $1,000, ascendiendo a un total de $12,000 por las doce servidumbres (5) el Condominio Caribe Plaza fue valorado en $86,000,000. Conforme a lo anterior, el valor total de todas las transacciones expuestas en la

Escritura Núm. 10 ascendió a $124,093,000. Al momento de someter la Escritura Núm. 10 no se había liberado ninguna parte del negocio antes expuesto de la suma total de los préstamos garantizados con hipotecas que se habían obtenido para poder financiar la construcción tanto del Estacionamiento Comercial, como del Condominio Caribe Plaza. Así las cosas, al momento de presentarse la referida Escritura, tanto la finca, el Estacionamiento Comercial y el Condominio Caribe Plaza estaban gravados por hipotecas que sumaban $95,050,000.

Como observamos, la Registradora de la Propiedad utilizó e interpretó las disposiciones de la Ley de Aranceles del Registro de la Propiedad de Puerto Rico para hacer dichas calificaciones. **En estos casos aplica la previamente discutida Norma Duodécima,** *supra*. **De las transacciones efectuadas en las escrituras, resolvemos que las que deben evaluarse bajo la Norma Duodécima son las compraventas pues son transacciones que tratan de casos de compraventa de fincas gravadas con hipotecas tal y como estipula la referida norma.** En aras de poder visualizar mejor las transacciones llevadas a cabo en ambas escrituras y los derechos pagados por las mismas, a continuación presentamos dos tablas que ilustran los derechos de inscripción que corresponden a cada transacción, el total en derechos que devenga todo el documento y la deficiencia de derechos.

Tabla I. Transacciones de la Escritura Núm. 2

| Transacción | Valor en la escritura | Valor que se debe considerar según el Art. 2 de la Ley Hipotecaria | Derechos de Inscripción |
|---|---|---|---|
| Edificación | $11,000,000 | $11,000,000 | $43,950 |
| Compraventa | **$11,000,000** | **$73,126,636** | **$292,458** |
| Derecho de Superficie | $1,000 | $1,000 | $2 |
| Servidumbres | $13,000 | $13,000 | $26 |
| Régimen de Propiedad Horizontal | $33,065,000 | $33,065,000 | $132,210 |
| Total de derecho de inscripción del documento | | | $468,646 |
| Total consignado en el documento | | | $220,270 |
| Deficiencia (derechos que faltan) | | | $248,376 |

Tabla II. Transacciones de la Escritura Núm. 10

| Transacción | Valor en la escritura | Valor que se debe considerar según el Art. 2 de la Ley Hipotecaria | Derechos de Inscripción |
|---|---|---|---|
| Edificación | $19,040,000 | $19,040,000 | $76,110 |
| Compraventa | **$19,040,000** | **$95,050,000** | **$380,150** |
| Derecho de Superficie | $1,000 | $1,000 | $2 |
| Servidumbres | $12,000 | $12,000 | $24 |
| Régimen de Propiedad Horizontal | $86,000,000 | $86,000,000 | $343,950 |
| Total de derecho de inscripción del documento | | | $800,236 |
| Total consignado en el documento | | | $496,322 |
| Deficiencia (derechos que faltan) | | | $303,914 |

A la luz de la información contenida en las tablas, podemos colegir que el precio de las hipotecas que gravan las propiedades es mayor que el precio de las transacciones de compraventa efectuadas en ambas escrituras.

Como vimos al analizar el estado de derecho, la Norma Duodécima responde al propósito legislativo de que el Arancel se aplique sobre la base que mejor refleja el valor en el mercado de la propiedad transmitida. Véase, Aponte Parés v. Registrador, supra; Somohano v. Registrador, supra. Por ello, el propósito moderno e irreversible que infiltra el arancel es aproximar en lo posible la base impositiva al valor real del derecho objeto de la operación registral. Empire Life Ins. Co. v. Registrador, supra; Aponte Parés v. Registrador, supra. Esta jurisprudencia no deja al azar ni a la voluntad de las partes la valoración del derecho de inscripción.

El peticionario, SGCP, nos invita a que, respondiendo al propósito legislativo de la Ley de Arancel del Registro de la Propiedad, supra, se tome como base para el cómputo de los aranceles el precio de venta de la edificación y el terreno que consta en la Escritura Núm. 2 y en la Escritura Núm. 10, porque ese es el valor real de la finca. En la búsqueda del verdadero valor de la finca es imprescindible tomar en consideración el hecho de que en este caso se trata de una finca de 1.5517 cuerdas en

una zona de alto valor comercial y residencial sobre la cual se construyeron varias edificaciones.

SGCP sustenta su reclamo en cuanto al precio de venta de la finca y de la Edificación Comercial en la Escritura Núm. 2 con una tasación firmada con los tasadores Luis E. Vallejo y Alberto E. Lanza, quienes indicaron que la cifra de $11,000,000 se refiere a su opinión acerca del "reproduction cost new of the Laguna Plaza residential and comercial ground floor and part of the phase II parking basement level which are all in the final stages of construction and from part of the ongoing Paseo Caribe Project, for the preparation of the Declaration of Edification".[2]

Es evidente que el lenguaje utilizado por los tasadores establece claramente que la suma de $11,000,000 no representa el verdadero valor en el mercado de la finca ni de la edificación. Dicha cuantía lo que representa es el costo de construcción estimado de la edificación solamente. Es decir, al constar en la Escritura Núm. 2 que el precio de venta de la edificación de la finca es de $11,000,000, es forzoso colegir que al terreno no se le computó o adjudicó valor alguno.

Por otro lado, el peticionario propone "que si se utiliza el valor global de las hipotecas para determinar los derechos de inscripción a pagar, el mismo se debe distribuir proporcionalmente a través de las transacciones

---

[2] Véase, Vallejo & Vallejo Real Estate Appraisers and Counselors, Appraisal Report, Anejo III del Recurso Gubernativo.

efectuadas".[3] Más adelante en su escrito, SGCP hace una distribución hipotética de las cargas hipotecarias de la finca a base de un porciento que representa el alegado valor de la finca y la edificación ($11,000,000) sobre el total de la suma del alegado valor de la finca, la Edificación Comercial y el Condominio Laguna Plaza.

La Registradora argumenta en su Alegato que "no existe disposición alguna en ley ni en la jurisprudencia que establezca que corresponde al Registrador hacer ese tipo de distribución".[4] En torno a la división de fincas y la distribución de las cargas hipotecarias, el Art. 174 de la Ley Hipotecaria establece que cuando una transacción como la del presente caso ocurre, las partes involucradas en la compraventa junto a la comparecencia del acreedor hipotecario, tienen la opción de liberar la finca segregada de las hipotecas o distribuir la carga hipotecaria entre las fincas. Esto tiene el efecto de que la carga hipotecaria adjudicada a cada finca se ajuste a la realidad y a su valor actual. Siendo así se podría utilizar ese valor como base para el cálculo de los derechos de inscripción arancelarios necesarios para poder ser calificados favorablemente. No obstante, SGCP tuvo disponible la opción de, con la comparecencia del acreedor hipotecario, liberar la finca y las edificaciones objeto de compraventa, el derecho de superficie y el Condominio Laguna Plaza, tal y como provee el Art. 174. A pesar de

---

[3] Véase, Recurso Gubernativo, pág. 2
[4] Véase, Alegato de la Registradora de la Propiedad, pág. 19

tener la opción, dicha distribución no se hizo, por lo que procede aplicar la Norma Duodécima del Art. 2 de la Ley de Aranceles.

Para la inscripción de la Escritura Núm. 2 se debía valorar la compraventa de la finca y la Edificación Comercial (que se había llevado a cabo en $11,000,000) en $73,126,636. Ello es así porque el valor de las hipotecas que SGCP había constituido para financiar el desarrollo completo y efectuar todas las transacciones incluidas en la Escritura sumaban en total $73,126,636. Esta es la cantidad que debía ser tomada como base para el cómputo de los derechos arancelarios de inscripción. Siendo así, faltó un comprobante de $248,376.

De otra parte, para la inscripción de la Escritura Núm. 10 se tiene que valorar la compraventa de la finca y el Estacionamiento Comercial (que se había valorado en $19,040,000) en $95,050,000. Ello por motivo de que este es el valor de la suma de las hipotecas que garantizan los préstamos para la construcción de la estructura total (Estacionamiento Comercial y el Condominio Caribe Plaza). En consecuencia, coincidimos con el criterio de la Registradora de que faltó un comprobante por $303,914 para completar los derechos de inscripción.

## V.

Cónsono al propósito legislativo de aproximar la base impositiva para el cálculo del arancel a lo que mejor refleja el valor en el mercado, confirmamos la denegatoria

de inscripción emitida por la Registradora de la Propiedad, Hon. Marisol Marchand.

Se dictará Sentencia de conformidad.


                                        Edgardo Rivera García
                                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

San Gerónimo Caribe
Project

Peticionario

v.

Marisol Marchand,
Registradora de la
Propiedad, Registro de
la Propiedad de Puerto
Rico, Sección Primera
de San Juan

Recurrida

Recurso
Gubernativo

RG-2013-003;
RG-2013-004

SENTENCIA

En San Juan, Puerto Rico, a 27 de noviembre de 2013.

Por los fundamentos expuestos en la Opinión que antecede, confirmamos la denegatoria de inscripción emitida por la Registradora de la Propiedad, Hon. Marisol Marchand.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez no intervinieron.

Camelia Montilla Alvarado
Secretaria del Tribunal, Interina